This is Zhejiang Medicine Co. v. Kaneka Corporation, No. 18-1618. Mr. Nowak, you reserved three minutes of your time for rebuttal. Is that correct? That's correct, Your Honor. And Mr. Hughes, out of your 15 minutes, you reserved two for the cross-appeal. Yes, Your Honor. Okay, Mr. Nowak, you may proceed. Keith Nowak, Your Honor, representing Kaneka Corporation. May it please the Court, I will begin with the sealed tank claim construction issue. In its opening statement, ZMC defined sealed tank for the Court as follows, and I quote, Sealed means protect what is inside the tank from exposure to the oxygen so it doesn't turn into oxidized Q10. ZMC then showed oxygen test to the jury, which the test showed that there was oxygen in ZMC's extraction tank. Then ZMC said to the jury, is there any oxygen in the tank? That's a good way to determine whether it's sealed or not. But you can see there was lots of oxygen. So what does that mean? It means there is no sealed tank. And if there is no sealed tank, we don't infringe. That is not the claim construction that was decided by this Court in the Kingdom Way decision. But ZMC had a plan and repeated that claim construction to the jury multiple times on day three, day five, day seven, and at least seven times in the closing argument. Now, and this, and not only was the claim construction incorrect, it was followed up by a video which showed oxygen in the tank to the jury throughout the trial. Now, my colleague is going to argue there are several reasons why the jury was not misled by ZMC's claim construction. And I will address each of them. First, they will argue that the claim construction that they proposed to the jury is the claim construction that was decided in the Kingdom Way decision. There is no support for this argument for the following reasons. This claim construction was rejected by the claim construction that ZMC presented to the jury. Do you have a puzzle question? No, I'm just listening. Go ahead. This claim construction that ZMC provided to the jury was rejected during the Markman hearing before Judge Gilmour. During the Markman hearing, Conaca made it very clear what its proposed claim construction meant. And I quote, the issue is not getting air into the tank. The issue is the vapors from the organic solvent getting out of the tank, which would create a hazard for the plant and the people in the plant because the hexane vapors are dangerous. So the claim construction that was rendered and decided by the Kingdom Way decision was based on safety concerns because that's what Judge Gilmour ruled during the Markman hearing in the lower court. And this court adopted her claim construction. The claim construction that was Conaca's claim construction had nothing to do with oxygen in the extraction tank. There was never any reason why there couldn't be oxygen in the extraction tank. So by ZMC telling the jury, if there's oxygen in the tank, there's no infringement, was a complete distortion of the meaning of that claim construction, which misled the jury. Now, neither, first of all, most importantly, neither ZMC or any other party proposed this claim construction to the panel in the Kingdom Way decision. Before that panel, there were two claim constructions at issue. One was whether the tank would be completely sealed, which the court rejected. And two, Conaca's claim construction was that the contents of the tank could not be released into the atmosphere for safety reasons. And that's the exact argument I made to the panel. And I have the transcript here. So that, therefore, since ZMC never made that argument before the Kingdom Way panel, which decided the claim construction in this case, that argument is waived. Now, the patent itself, which is very important. The patent itself specifically says that when producing oxidized Q10, which claims 22 and 33 call for, there is no need to prevent the reduced Q10 from an oxidation reaction. The patent says that. It's very clear, right? During the trial, if you look at the transcript, during the trial, Judge Gilmore repeatedly told ZMC that the claim construction it was telling the jury was incorrect. And I'll give you some examples of that. Conaca's claim construction was the claim construction. I'm a little confused as to your argument, Mr. Nowak. Are you saying that the jury, I mean, the judge did not correctly instruct the jury on the claim construction? Here's the problem, Your Honor. Yes, the judge read the correct claim construction, the correct words to the jury. Right? That took all of seven seconds. There was no way the jury could understand that the words that were being read to the jury were correct. But the meaning of those words were not the correct definition they received from ZMC. At that point when you read, when this happened, did you object to that instruction? All right. Very good question, Your Honor. Throughout the trial, Conaca continually objected to each time that the improper claim construction was used. Twice, Conaca moved to strike the testimony for the incorrect claim construction. And that was, those motions to strike were denied. It was obvious to us at the trial that it was futile to try to attempt to file a motion for a revised claim construction because of what happened during the trial. And I can give you some examples of how Judge Gilmour handled the objections. On day six of the trial, for example, ZMC told the court that oxygen in the tank means it's not sealed. The court said to ZMC, I am not buying that. And the jury doesn't understand it. So it's a total and complete waste of time. But knock yourself out. Essentially saying to ZMC that even though you're using the incorrect claim construction, you can continue to use it. On day seven of the trial, Dr. Taylor, their expert, testified that a sealed tank had to be free of oxygen. We objected and moved to strike. The court denied the motion to strike and said to the jury, he keeps doing it, ladies and gentlemen. The court will give you the instructions on how the court will interpret the claim terms. Just leave it alone. Your brief very nicely goes into the detail of this. I'm sorry? Your brief goes into the detail of this. Okay. And so I want to know what your thought is on the Verizon case and why the district court's construction that it gave to the jury, which was the correct construction. Right. And the other evidence in the case that was presented to the jury, why that's not sufficient so that this case is like Verizon and that there's no need for a new trial. All right. The Verizon case, Your Honor, in the Verizon case, the parties had previously agreed on the claim construction issues. Right. Let me look at my notes here. They had previously agreed on the claim construction issues and the seal tank was clearly in dispute throughout the trial in Texas. In Verizon, the defendant limited the scope arguments to claim terms that had not been interpreted. So they were the arguments that were made in the Verizon case with the appellant was complaining about is that claim terms that had not been decided, there was no claim interpretation for those terms, no claim definition for those terms. That's the ones that we're complaining about. We were complaining specifically about claim terms that had been decided by the Federal Circuit, which was the law of the case. All right. In Verizon, they never objected to the scope arguments during the trial. We objected each time that the incorrect claim term was used. And Judge Gilmour told ZMC's counsel that the claim terms they were using were incorrect multiple times during the trial. So it's not... And Verizon also conceded that the scope statement was not objectionable, but somehow taken together, the scope statement for prejudicial. We never made that argument. Our complaint was that the claim term seal tank being read to the jury was incorrect. There was no dispute from the beginning that there was oxygen in ZMC's extraction tank. In the Kingdom Way appeal, we dropped claims 9 and 11 because they had the intergas atmosphere claim terms. So everyone knew there was oxygen in their extraction tank. So ZMC, by saying that's what the claim definition of seal tank meant, it was clearly not an infringement issue. Does that answer your question, Your Honor? Sure. Okay. So, in terms of... Let's go back to the issue on why we didn't ask for a new jury instruction. If there's a Fifth Circuit case, Hammond versus Southwestern Gas Pipeline, 821 Fed Second 299, where the Fifth Circuit held, in cases where the trial court has been presented with undisputed facts, any disputed question of law, where parties' arguments on the question of law have been brought to the court's attention, and where the court has decided the question of law during the course of the trial, we have not required the unsuccessful advocate to object to the jury charge to preserve the issue for appellate review. We objected throughout the trial. Judge Gilmer listened to our objections and denied our motions to strike. Federal Rule of Evidence 103 reaches the same conclusion. That is why we didn't ask the court for a revised jury instruction because it would have been futile. Our position, Your Honors, is under the general verdict rules, changing the subject, is that the definition that was given to the jury on seal tank resulted in a legal error because that definition was incorrect. Under the general verdict rule, if there is a legal error on either seal tank or oxidizing, there has to be a new trial if we can show that there was evidence under the correct claim construction for seal tank and oxidizing, and we have that evidence. Let's see if I understand exactly what you're saying about the correctness of the instruction. Yes. Initially, I think in response to Judge Stoll's question very early in your argument, you said that the instruction itself was correct. But now we're saying, well, the district court's instruction on this, the seven-second instruction was correct. Now you're saying, well, it really wasn't correct because of everything that happened at trial. Are you saying it should have been supplemented or what is your argument? Let me – I can see that there is some confusion here. So let me explain. The claim construction says the tank's contents must be prevented from exposure to the atmosphere. That's what the claim construction says, right? That meant, and that's what I argued before the panel in the Kingdom Way case, that that meant the contents could not be released into the atmosphere because the hexane vapors were dangerous. That's what Judge Gilmour decided. That was the argument made before Judge Gilmour. Judge Gilmour said that the claim construction meant the contents could not leave the tank for safety reasons. So is your argument that the instruction that was given to the jury was erroneous because it didn't include that latter clause? No. That it should – that the vapors should not be free to go out into the atmosphere. No, the words given to the jury was the words that the Kingdom Way court had concluded. And therefore was correct to that extent. Correct to that – but let me try it one more time. If the claim construction says the tank's contents must be prevented from exposure to the atmosphere, that meant, after every argument in this case, meant that the contents of the tank, right, the hexane vapors could not be released. The argument that was given by ZMC is those same words meant that you couldn't allow oxygen coming into the tank. Didn't they also present testimony and evidence that there was hexane that was being released into the atmosphere? I've got it. Yes, I've got it. I've got the answer to that, Your Honor. Right. So let me address that issue. Is it clear what I meant when I – No, actually it's not. I thought you were saying that the instruction was correct, but it needed to be tweaked or supplemented by saying that what is meant by this instruction is that the vapors cannot be allowed to escape into the atmosphere. And it doesn't mean – No, I'm sorry, Your Honor. You are correct. It means that the vapors – I'm correct in thinking that – The vapors cannot be allowed to escape into the atmosphere. So that should have been added to the instruction. Is that your argument? How can this – this is not the – Well, that's a simple question. If that – The words of the claim construction decided by the Kingdom Way panel can mean two different things. And your argument, I thought, was that one of those two things is wrong and the other is right. Correct. Therefore, the judge should have instructed the jury as to the right one and precluded them from concluding infringement or non-infringement based on the other. That's correct. Okay. That's – okay. That's the answer to my question. Okay. All right. So – And you – you're out of time, Mr. Nowak. I'm out of time? Yes, sir. I'll – I'll restore some of your rebuttal time back, okay? Okay. Mr. Hughes. Thank you, Your Honor. May it please the Court. Paul Hughes for Applee Cross-Appellant ZMC. Before I dive into each of the different incidents that Connick could discuss, I'd just like to step back for a moment and talk about a few general principles. The first is the jury in this case was properly instructed. The jury instructions were stipulated by both parties prior to trial, and no party, after they stipulated to the jury instructions, asked the jury – asked the district court to instruct the jury in a different fashion. So is this case like Verizon, and if so, how? Yes, Your Honor. I think it's just like Verizon because, like in Verizon, there was agreement as to the claim construction. There wasn't a claim construction dispute. And the argument that was made in Verizon was that attorney arguments somehow confused the jury from following its proper instructions. This court rejected that argument, and it applied Verizon also in Function Media versus Google to reject that argument. And the reasoning the court gave in Function Media was to say, if you allow this kind of argument, it would mean that any jury trial in which whenever an attorney doesn't use the precise language that's ultimately used in the jury arguments in the course of their argument, that would become recipe for an appeal and reversal. And that's not at all what this court allows in that kind of abusive expression. So your argument, I take it, is then that they got the instruction to which they agreed, and had they gotten to the point of the judge instructing the jury and feeling they had felt that that instruction could have been misunderstood, as they view it, to cover the exposure of the contents to the atmosphere as opposed to the exposure of the atmospheric contents, then they should have asked for a supplemental instruction clarifying that point, which they either would have gotten or not. And the failure to ask constitutes, I take it, your argument, is a waiver of the right to any such supplemental instruction. Yes, Your Honor, that's precisely correct. Because if that's not the case, any losing party to a jury verdict is always going to be able to find an instruction that they wish had a bit more specificity on it. And if they weren't obligated to bring that to the district court's attention, this court would be inundated with appeals from every time that there was a jury verdict in a patent case where the losing party... We already are. Well, yes, Your Honor. But they would have an argument that they don't have to preserve for appeal their contention that over the course of trial something has changed and the district court is obligated to modify or tweak a jury instruction from what the party agreed. Here, Conaca and ZMC got together, they agreed on the jury instructions, and no one asked the district court to instruct the jury in any way differently. This court is aware there's a very strong presumption that juries follow their instructions. That is really the backbone of the jury trial system. That's how curative instructions and everything along these lines work. My second broad point is that there was abundant evidence in the record for which the jury could find two multiple theories of non-infringement, both with the sealed tank and the oxidizing. We can talk through that, but we lay that out in our briefs. The third point is that it is an extraordinarily high standard for them to meet to suggest that this kind of prejudicial jury statement, the jury argument, confuses the jury and is a reason to set aside a jury verdict in the context of a properly instructed jury. The abuse of discretion standard is really at its height here because the trial court has a front row seat to what's happening in the court. As my friend read, there were several instances in which the district court was carefully policing the parties and talking about each of the various incidents that Conaca describes in their brief. This is not a court that was asleep at the switch by any stretch. The court was vigorous in enforcing the claim construction throughout the case. So there's certainly no basis to find that the district court abused its discretion in finding that there was no basis to have a new trial in the context of this particular case. Now, I'll talk for a moment about the discussion Conaca raises about oxygen being into the tank and to talk about that both from a factual matter as to why that supports our theory of non-infringement and second, their argument that they want a separate construction. I think those arguments are waived for reasons Judge Bryson said. I don't think they're before the court, but the court even thinks about addressing them. First, it is an appropriate theory of non-infringement that we presented to the court. If atmospheric air enters the tank, that is a basis to believe that it's not a sealed construction. Why is that? This court's construction from the Kingdom Way case is a sealed tank, a tank that prevents exposure of the tank's contents to the atmosphere. If the outside atmosphere enters the tank, the tank's contents are not being protected from exposure to the atmosphere. It's a very straightforward argument. Our evidence showed two things, as Judge Stoll noted, both that the contents of the tank were escaping into the atmosphere, that's the hexane smell, but additionally, during the extraction step, that there was an oxygen spike, that there was a lower level of relative oxygen in the tank, and at some point that oxygen level spiked up. The expert testimony is, what was the cause of that spike? The cause of the spike was atmospheric air coming in through the vent valve assembly, entering the tank, demonstrating that it is not a sealed tank. Now, Conaca, as I think I've explained, their argument seems to hinge on this notion that the sealed tank should only prevent escape of material to the outside, which we have evidence of, and doesn't preclude a tank that allows the entry of atmospheric air into the tank. But as we said, that's contrary to what this Court's construction in the Kingdom Way case is, and frankly, that's contrary to what Conaca has said throughout other stages of this case. So in their summary judgment opposition brief, this is appendix pages 3313 to 3314, Conaca said a sealed tank must, quote, prevent entry of outside air. That's the argument that they've made, and we're in agreement with that. If outside atmospheric air can enter the tank, it's not a sealed tank. It's consistent with this Court's construction. Further, in the Kingdom Way case, appendix page 3385, Conaca argues that a tank must, quote, protect the contents of the tank from outside contamination. If atmospheric air can enter the tank, then there is direct contamination, and that is not a sealed tank. Conaca's argument now, as they've presented in both their briefs and their argument today, suggests that what is really at issue here is not a sealed tank, but a safety tank. And as long as the tank maximizes operational safety, that's the way in which it should be construed. What was the citation? I think it was to the summary judgment briefing that you just said. It was appendix, yes, Your Honor, it was appendix page 3313 to 3314. Okay, thank you. So Conaca's argument that sealed tanks should take on some other means because there's a way for this procedure to operate safely with atmospheric air entering the tank. That may well be true as a factual matter, but that isn't a sealed tank. Sealed tank has a particular meaning, and that was the meaning this Court gave it in the Kingdom Way decision. We said it's a tank that prevents exposure to the tank's contents to the atmosphere. In that same decision, the Court was quite clear in construing the sealed tank, looking to Figures 1 and 8, and the Court said Figure 1 and 8, Example 8, suggests that the sealed tank should be sealed to the atmosphere. So the Court said the sealed tank should be sealed to the atmosphere. That's a natural reading of sealed tank, and atmospheric air that enters the tank demonstrates that it is not a sealed tank. So then to go back to our broader point again, with respect to sealed tank, we have evidence going both directions, both with the construction that Conaca is now willing to concede, that if material is in the tank and it exits the tank, that that's not a sealed tank, and we have lots of evidence of that. Alternatively, if atmospheric air from outside enters the tank, it's not a sealed tank. We have substantial evidence on that. We have evidence on both of these theories, both of which are well within this Court's construction of sealed tank. But to go back to where I started at the end of the day, this is a clear case in which the parties agreed to the jury instructions. The jury was properly instructed. There was never any objection to the nature of the jury instructions with respect to sealed tank or oxidizing. The jury, having had these proper instructions, had very substantial evidence with which to conclude in ZMC's favor. It ultimately did so, and we think there's no way to find an abuse of discretion against this backdrop. Now, we, throughout our brief, I believe, talked through each of the different incidences that Conaca describes where they think that there was a particular issue. Conaca just raised two of the particular issues that repeat throughout their briefs. One is a sidebar conversation before the jury. This is the discussion at appendix page 1584, where the Court suggests that the jury is not understanding the argument. Again, that is not the judge saying that she is allowing some sort of improper construction to get argued to the jury. This, when the Court reads the broader context, which we describe in our brief, ZMC's argument is making very clear that it's the argument about oxygen entering the tank and oxygen from outside the system entering the tank. The argument was not that if there's the presence of any oxygen in the tank, that's what does it. The argument, as was made very clear around appendix pages 1583 to 1584 before Judge Gilmour, was as evidence that atmospheric air from outside the tank is entering. My friend also made notion to appendix page 1997 about the quote where Judge Gilmour described inconsistent testimony. Well, I think there are at least two things notable about that passage. The first is the Court very clearly told the jury, I, the Court, will be instructing you as to what the law is. Judge Gilmour repeated that throughout the trial, and she repeated it twice in that particular passage. So Judge Gilmour is telling her jury in this context, I will tell you what the law is and you will follow my instructions, not the party's, which is, of course, correct. There's nothing erroneous about that. But the second point is when the Court looks to the broader passage, there was no improper argument regarding claim construction in any stretch. So we think that there was no inconsistent or wrong claim construction that was being argued there.  Let me ask you first, is this a conditional cross-appeal? You refer to it in your brief as in the alternative. Is this, well, is it conditional? Your Honor, we have not framed our briefs as being a conditional cross-appeal. We have a standalone claim for declaratory judgment of invalidity that this goes to. I will say if the Court. Nonetheless, a party can see that this is conditional. If you choose to do so. Your Honor, yes. If the Court affirms in its whole the jury verdict, we will stipulate that the cross-appeal would be conditional in that event, that ZMC would be satisfied with an affirmance of the jury trial that they do not infringe these claims and that would be a satisfactory resolution to this case. Thank you, Your Honor. But I'll just touch on the utility argument for a moment. The Court question here is whether or not for the utility analysis when the process, the utility analysis focuses on the output of the whole process or if it focuses on the improvement. We think there are very substantial reasons to think it needs to focus on the improvement or else a non-obvious but yet non-useful limitation could have the effect of preempting an otherwise known manufacturing process. Whether or not this is a useful improvement is certainly something not before the Court. That's the factual question that we think should be put to the jury or to the fact finder below. So we certainly don't ask the Court to decide that here. I take it that, I mean, this seems to come up very infrequently in the only two cases that were cited are cases from before the creation of this Court. Perhaps the reason for that is that if there is a particular limitation that has no utility that most people won't use it. Well, I think that's probably right, Your Honor. This is the question in my mind. Why do you? Well, why don't we have a design? I think the problem here is, well, first, this is retrospective damages. I understand. So the question here is maybe we could. We'll have a category of cases in which there may be somebody that has used it for reasons unbeknownst to anyone, but they've used it and they didn't bother to design around it. Well, I think that might be right, Your Honor, but I think the broader theoretical problem with this is you add a limitation that's not useful, but then you have the problem of preemption. So here the requirement is over 70 mole percent limitation. And then I agree there would be a way for when you're creating oxidized CoQ10 to design around that and not reach that limitation. Simply by not using any reduction at all. But, Your Honor, the problem becomes once you allow that limitation, then the next person comes along or the same person comes along and patents the 50 to 70 percent mole limitation, then you patent the 30 to 50 percent, then you patent the less than 30. The problem is if you can identify a non-obvious distinction and then patent it one by one by one in steps, that would lead to the preemption of the process in a way that would be problematic. Well, at some point it would be problematic because you would get to a point in which it would have some theoretical utility, in which case the utility argument goes away. That is true, Your Honor, but then what you're really doing is just being a trap for the wary. And at some point there might be a utility argument, and if they can identify what that is and patent that, we're fine with it. But the point is they have to actually identify what the mole percent is that actually has utility, and it can't be something that they have just known manufacturing processes and unbeknownst to them are hitting what we believe is an irrelevant step or irrelevant mole limitation. And so that's why we think there should be utility analysis. Now, maybe they can show that as a matter of fact. That's not before the court. The question is, have they identified in the patent or anything else that would be appropriate to look at a utility for that particular limitation? We certainly don't think that they've done so. It's a factual question, again, that we don't think is before the court, but the fundamental question is, does the utility analysis apply to this context or does it apply just to the output of the process that it produces, oxidized CoQ10, and we think the analysis has to be on the improvement. That's consistent with all the court's Section 101 cases in the subject matter area where the court looks to what the patent claims are directed to, and we think that same kind of directed-to analysis would properly apply in the context of Section 101 in utility. And yet there really haven't been any cases from this court at all, I guess, on this issue, right? That's right, Your Honor. I don't think it's an issue that's going to come up with any frequency, so I don't think this has any of the sorts of effects that 101 subject matter does because it is going to be quite rare. Well, I suppose that's probably right, yeah. I don't think the circumstances that give rise to this are ones that are likely to recur. I do think that's right, Your Honor. Thank you. Thank you. Your Honor, let me address the utility issue very briefly. Dr. Alpert, the expert for – validity expert for Conica, pointed out at Appendix 1443 and 1444 that the reduced Q10 has increased solubility over oxidized Q10. And because of that increased solubility, you can use less hexane as a solvent, which means less production cost because hexane is expensive. And there's a higher rate of discovery – of recovery, I should say, for the product, which means that it's making more reduced Q10 first. Because the solubility is different than oxidized Q10, saves money and you get a better product by the mere fact that you get 70 more percent of reduced Q10 before that reduced Q10 is oxidized. But let me go back for a moment to the – I don't think you made that argument in your brief, did you? I'm sorry? You didn't make that argument in your brief, if I recall. Yes, there is a section in our brief on utility. Yes, Your Honor. Well, there is a section on utility, but the argument based on the 1443-44, I don't recall that being made in your brief. We certainly cited Dr. Alpert's testimony, and I gave the appendix numbers for Dr. Alpert's testimony. So that should also be in the brief. Thank you. Well, I'm not seeing it, but… I'm not seeing it either. What I just said, I may have mentioned the wrong numbers, but at page 54 of our brief, we – of our reply brief, we talk about utility. Yes, you do. But the question is, do you make the argument that you're just now making about the utility? And I don't recall that argument or the citation to Dr. Alpert's testimony as being part of that argument. Let me find it. Did you say 1443 of the appendix? Yes. I don't have 1443 in my appendix. My appendix skips from 1438 to 1459. Let me check the appendix again. Yeah, appendix at 1443, line 14, and appendix 1444 at line 18. Well, but the copy of the appendix that we were given does not have those pages in it unless they are misplaced. No, they're not. Well, I apologize, Your Honor. Only the pages that are actually cited in the briefs will be put in the appendix. The appendix that's prepared for the court. Okay, all right. So I understand that. We made the Albert argument in the brief, so I gave you the wrong one. You made it. You didn't make the Albert's argument in the brief, right? We made the utility argument in the brief. You didn't make the particular utility argument that you're now asserting in the briefs, as I understand it. I don't see anything that is even close to this argument in your section on utility. I think I gave you the wrong citation, but I apologize, Your Honor. That's fine. You're out of your time. Unless you want to conclude very, very briefly. My only conclusion I have, Your Honor, is on the claim definition for a sealed tank. I made that argument before the Kingdom Way panel. You, Your Honor, was one of the judges on that panel. I specifically argued that the purpose of the sealed tank was to prevent the contents from leaving for safety reasons. Judge Gilmour, that's what she said. And the court adopted Judge Gilmour's exact words. Therefore, correct or not, my belief was always that that's what the claim construction meant. Not to prevent oxygen from coming into the tank, because the patent says there's no reason to do that. When you're making oxidized Q10, the patent specifically says that. And I can give you the actual quote, or the patent says that specifically. So, our argument has been the same before Judge Gilmour, before the ITC, before Judge Flasher, before the court in the Kingdom Way argument, and in this brief, that that's what the claim term means. Because this court adopted Judge Gilmour's language. I think you've made that point already. I guess I did, Your Honor. Okay, thank you, sir. Mr. Hughes, you addressed your cross-claim. Your Honor, I have nothing to add. Do you have anything else? I'll take any questions the court might have. Okay, we don't have any questions. Thank you. Thank you, Your Honor. Thank the parties for their arguments.